UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MICHELLE CALDERONE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 13-6687** |
| **TARC** | **SECTION "L" (3)** |

ORDER & REASONS

Before the Court is Defendant TARC's Motion for Summary Judgment (Rec. Doc. 13). The Court has reviewed the parties' briefs and applicable law and now issues this Order & Reasons.

I.   BACKGROUND

This case involves a claim made by Plaintiff Michelle Calderone against her former employer, TARC, under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 260, Americans with Disabilities Act of 1990, 42 USC § 12101 ("ADA"), as well as the Louisiana Employment Discrimination Law, LSA- RS 23:321-325.  According to Calderone's complaint, filed on December 17, 2013, Calderone was employed by the Defendant TARC as a Program Coordinator.  TARC is a non-profit that provides a variety of services to persons with special needs in the Florida Parishes area of Louisiana.  Calderone claims that on December 19, 2011, she was injured in an automobile accident.  (Rec. Doc. 1 at 3).  According to Calderone, she was diagnosed with a fractured sternum on January 25, 2012.  Calderone claims that her physician told her that she would not be able to work in the office but could work from home instead. (Rec. Doc. 1 at 4).  Calderone alleges that the Chief Executive Officer, Kathleen Abels, began

1

acting hostile toward her. (Rec. Doc. 1 at 4). Calderone claims that the hostility at work got so bad that she tendered her resignation in November, 2012. (Rec. Doc. 1 at 5).

Calderone alleges that she was subject to the Family Medical Leave Act and that the Defendant interfered with her FMLA protected rights by failing to inform her of those rights. Calderone also claims that the Defendant violated the Americans with Disabilities Act of 1990, 42 USC § 12101 as well as the Louisiana Employment Discrimination Law, LSA- RS 23:321-325. Calderone asks to be compensated for loss of earnings, loss of benefits, and statutory penalties. (Rec. Doc. 1 at 5). Calderone also asks the Court to order that she be reinstated. (Rec. Doc. 1 at 9).

On June 2, 2014, TARC filed an answer in which it denies that Calderone had a disability or impairment that substantially limited her activities. TARC denies all liability and asserts various affirmative defenses.

## II.   UNDISPUTED FACTS

TARC hired Calderone as a social worker in 2000, and she remained employed there until her resignation in 2012. Kathleen Abels joined TARC as CEO in 2010 and remains at TARC in this capacity. (Rec. Doc. 13-4 at 33). According to Calderone, about a year after TARC hired Abels, Calderone and Abels started to experience a problematic working relationship. (Rec. Doc. 13-5 at 22). Calderone testified that their relationship only got worse over time, and starting in 2010, they would have "daily disputes." (Rec. Doc. 13-4 at 24, 58). Indeed, Calderone stated that "the last couple of years I was there, it was just a very hostile environment. It was no secret…throughout the agency that she and I didn't get along." (Rec. Doc. 13-5 at 26). Calderone met with two TARC board members in June 2011 to discuss her

issues with Abels.  (Rec. Doc. 13-5 at 33).  Calderone also began to maintain records in 2011 of her problems with Abels to prepare for a meeting with the board.  (Rec. Doc. 13-4 at 35).

On December 19, 2011, Calderone was injured in a car accident.  Calderone returned to work after the Christmas holidays and worked the entire month of January.  (Rec. Doc. 13-4 at 87).  On January 25, 2012, Calderone's doctor diagnosed her with a fracture.  Calderone and her doctor discussed the options of bedrest versus working from home, and Calderone ultimately decided that she would prefer to work from home because she felt that no other TARC employee could cover her job in her absence.  (Rec. Doc. 13-4 at 88).  Calderone's doctor approved of this plan, and Calderone spoke with Abels who also agreed to this plan.  (Rec. Doc. 13-4 at 89-90).  Calderone testified in her deposition that during this time TARC never offered her FMLA leave but she knew FMLA leave was an option.  (Rec. Doc. 13-4 at 91).  Nevertheless, she testified that she "wouldn't have taken [FMLA leave] [ ] as long as they allowed me to work from home."  Calderone thus worked from home for two months and then went back to work part-time in March 2012.  (Rec. Doc. 13-4 at 92).

TARC provided Calderone with an agreement ("the Agreement") that outlined her part-time work schedule.  The agreement stated:

> In the continued attempt to accommodate the recently disabled employee, Michelle Calderone, TARC has immediately implemented the following temporary modified job description and list of essential job functions for the position of Director of Pragmatic Services.  The sole purpose of this temporary modified job description is to provide the employee an opportunity to perform her duties despite her disability.

(Rec. Doc. 13-5 at 5).  The Agreement then outlined that Calderone would work twenty (20) hours from home and twenty (20) hours at the TARC office through

March 31, 2012, at which point her job duties would revert to normal.  (Rec. Doc. 13-5 at 5).

Calderone refused to sign the Agreement and took issue with the fact that the agreement referred to her as "disabled."  (Rec. Doc. 13-5 at 98).  She later testified that she does not think that TARC thought she was disabled but was merely trying to incense her.  (Rec. Doc. 13-5 at 133).  In response to the proposed agreement, Calderone sent a letter outlining her reasons for refusing to sign the Agreement.  Specifically, she said stated, *inter alia*, that (1) she did not consider herself disabled and attached a definition of the term; (2) the CEO told her that the Executive Committee would require her to return to work full-time on April 1, 2012; (3) there was no provision requiring a physician's release as a condition to her return to full-time employment; (4) FMLA was not mentioned as an option.  (Rec. Doc. 13-5 at 2). In her deposition, Calderone stated that Abels had vocally expressed that she could not work the part-time schedule, but the part-time schedule was contained within the Agreement, thus either undermining Calderone's testimony or indicating that Abels experienced a change of heart. (Rec. Doc. 13-4 at 100).

Calderone returned to work full-time April 1, 2012.  Calderone's doctor released her to go back to work full-time on this date, and Calderone did not ask for any leave in April.  (Rec. Doc. 13-4 at 127).  Calderone testified that "[m]y doctor asked me, 'Do you feel like you can go back to work April 1st?' And I said, 'Yes.'"  (Rec. Doc. 13-4 at 105).  She further testified that she felt like she had to go back because her job was in jeopardy.  (Rec. Doc. 13-4 at 105). Calderone testified that she did not take FMLA "because [she is] a dedicated person to my staff and employees and my kids" and because she knew that nobody could do her job.  (Rec. Doc.

13-4 at 102-03).  She later testified that if the CEO would have reassured Calderone that she was capable then Calderone would have taken FMLA.  (Rec. Doc. 13-4 at 123).

Calderone resigned from TARC on November 15, 2012.  In her letter of resignation she wrote: "Over the last year and a half, it has come to my awareness and heartfelt decision that I cannot successfully continue to evaluate and direct my programs under the current CEO's supervision style and micro-managing."  (Rec. Doc. 13-7 at 4).  Calderone's deposition testimony further reflects this sentiment, as she testified that she started training someone to do her job six months prior to her resignation in anticipation of her departure.  (Rec. Doc. 13-4 at 69-71).  She also explained that she resigned because of the hostile working environment that started in 2010.  (Rec. Doc. 13-4 at 72, 128).

### III.   PRESENT MOTION (Rec. Doc. 13-3)

Defendant TARC argues that summary judgment is appropriate because Calderone's claims fail based on the undisputed material facts.  First, TARC contends that Calderone's FMLA claim fails because (1) TARC gave proper notice; and (2) Plaintiff's failure to take FMLA leave was not caused by a failure of TARC to notify her of her claims. (Rec. Doc. 13-3 at 4).  TARC avers that that the poster in TARC's break room complies with the FMLA notice provision, and Calderone was aware of her right to take FMLA leave but chose not to take it for other reasons.  (Rec. Doc. 13-3 at 4).  Specifically, TARC argues that Calderone testified that she refused to take leave because she felt her boss was unable to perform Calderone's job in her absence.  (Rec. Doc. 13-3 at 5).

Looking to Calderone's claim that TARC discriminated against her in violation of the ADA, TARC contends that there was no hostile work environment based on disability.  TARC argues that two undisputed facts demonstrate the falsity of Calderone's claim: (1) Calderone

alleges the hostile work environment well before she became disabled; and (2) Calderone admits that TARC harbors no animosity towards the disabled. (Rec. Doc. 13-3 at 5-6). Indeed, during Calderone's deposition, she testified that she did not believe that her superiors even thought she was disabled but were attempting to anger her by labeling her as "disabled". (Rec. Doc. 13-3 at 8). Finally, TARC contends that the evidence does not support a finding of constructive discharge based on the relevant factors. (Rec. Doc. 13-3 at 11).

Calderone opposes the motion. Calderone argues that TARC failed to comply with the FMLA notice requirement "by failing to engage in the dialogue about [P]laintiff's need for FMLA leave as soon as it became obvious that [P]laintiff had a serious condition…." (Rec. Doc. 19 at 5). Calderone continues and states that her "voluntary and uncoerced acceptance of a light duty assignment did not constitute a waiver of [P]laintiff's prospective FMLA rights." (Rec. Doc. 19 at 5). Plaintiff acknowledges that she returned to work on April 1, 2012 but contends that she was still injured despite the release from her doctor and she had not exhausted her FMLA leave.

Calderone argues that it "is an uncontradicted fact that the [D]efendant regarded the [P]laintiff as disabled." (Rec. Doc. 19 at 7). Calderone further asserts that it was only after TARC received Dr. Zerangue's note that TARC became increasingly hostile. Moreover, Calderone argues that TARC was obligated to have a dialogue with Calderone about reasonable accommodations but only offered Calderone an ultimatum to return to work on April 1, 2012. When Calderone responded to this ultimatum with a letter on March 14, 2012, TARC failed to respond, and Calderone insists that this action violates the ADA.

### IV. LAW AND ANALYSIS

#### A. The Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Id. When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party [and a] fact [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

#### B. FMLA Claim

Calderone alleges that TARC interfered with her FMLA rights by failing to give her notice and this violation caused her damage. (Rec. Doc. 1 at 5). The wording of her complaint is vague, and one can reasonably infer two separate FMLA claims. Calderone's opposition, however, focuses solely on her failure to notify allegation and separates this claim into two distinct time periods: January 25, 2012-March 1, 2012 and March 1, 2012-April 1, 2012.

Nevertheless, the Court will presume that Calderone alleges two FMLA claims, (1) interference with her FMLA rights and (2) failure to provide individualized notice of her rights under FMLA.

As background, tht FMLA guarantees eligible employees a total of twelve weeks of leave in a one-year period when the leave is related to certain circumstances, such as the birth of a child or the presence of a serious health condition. 29 U.S.C. § 2612(a)(1). Upon the employee's timely return, the employer must reinstate the employee in his or her previous position or an equivalent position. *Id.* § 2614(a)(1). The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of" an employee's FMLA rights. *Id.* § 2615(a)(1). Employers who violate this provision are subject to consequential damages and appropriate equitable relief. *Id.* § 2617(a)(1).

1. **Interference**

To establish a prima facie interference case, Calderone must show that (1) she was an eligible employee, (2) TARC was an employer subject to the FMLA's requirements; (3) Calderone was entitled to FMLA leave; (4) she gave proper notice of her intention to take FMLA leave, and (5) TARC denied her benefits to which she was entitled to under the FMLA. *Lanier v. Univ. of Texas Southwestern Medical Center*, 527 Fed. Appx. 312, 316 (5th Cir. 2013). Here, Calderone admits that she never requested FMLA leave. Specifically, she repeatedly emphasized during her deposition that she did not want to take FMLA leave because she felt nobody could adequately handle her job in her absence. She also testified that she never asked TARC for FMLA leave. (Rec. Doc. 13-4 at 126). These undisputed facts indicate that she never gave notice of any intention to take FMLA leave, and her claim for interference therefore fails under the fourth element of FMLA interference.

2. **Failure to Notify**

The FMLA contains a general notice provision requiring that employers "keep posted, in conspicuous places…a notice…setting forth excerpts from, or summaries of, the pertinent provisions of this chapter and information pertaining to the filing of a charge." 29 U.S.C. § 2619. The FMLA also imposes a specific notice provision on employers, requiring them to give notice of FMLA leave when an employee takes leave that could qualify as FMLA leave. *Downey v. Strain*, 510 F.3d 534, 541 (5th Cir. 2007). Here, there is no dispute that TARC satisfied the general notice requirement, as TARC maintained a poster in the breakroom and included information in the TARC manual that informed employees of their FMLA rights. (Rec. Doc. 13-7 at 6-9). Calderone even admitted during her testimony that she had read the FMLA notice and was aware of her rights. (Rec. Doc. 13-4 at 91, 125-6).

Calderone nevertheless alleges that TARC violated her FMLA rights because her employer failed to discuss her FMLA rights with her when she worked from home in February and never offered her FMLA leave when TARC reverted her schedule back to normal on April 1, 2012. This argument signifies a misunderstanding of the law. There is no affirmative duty on the employer to engage an employee in a FMLA dialogue when the employer suspects that the employee may have an injury for which FMLA leave would be appropriate. Rather, the specific notice provision only mandates that an employer notify an employee of FMLA when the employee takes leave that could qualify as FMLA leave. That is not the case here because Calderone never took leave; she worked on a modified or regular schedule throughout the duration of the time at issue.

In a similar case, *Bernard v. Bishop Noland Episcopal Day Sch.*, the district court concluded that a plaintiff's employer did not violate the FMLA notice provision because the plaintiff failed to show any prejudice from a lack of individualized notice. 2:13-CV-3284, WL

252223 (W.D. La. Jan. 20, 2015). In its holding, the district court's emphasized how the plaintiff had testified that she had received notice of the leave policy in the handbook and via email. The court thus concluded that the plaintiff was aware of the FMLA policy and chose not to take leave, thus rendering the plaintiff unable to show how her employer's failure to give individualized FMLA notice caused her harm and defeated her claim. The same is true of Calderone, as Calderone repeatedly testified that she was aware of her FMLA leave but chose not to exercise those rights because she felt no other TARC employee could adequately fulfill her duties. Calderone's own testimony therefore compels this Court to grant summary judgment to TARC on Calderone's FMLA failure to notify claim.

### C. ADA Claims

Calderone claims that TARC created a hostile work environment and took adverse employment action against her because of her disability, both in violation of the ADA.

#### 1. Hostile Work Environment.

For a hostile work environment claim to prevail under a disability discrimination theory, Calderone must prove: (1) that she belonged to a protected group, (2) that she was subjected to unwelcome harassment, (3) that the harassment complained of was based on her disability, (4) that the harassment complained of affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action. *Flowers v. S. Reg'l Physician Services, Inc.*, 247 F.3d 229, 235–36 (5th Cir.2001). For harassment to affect a term, condition, or privilege of employment, the harassing conduct must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Id.* (citing *McConathy v. Dr. Pepper/Seven–Up Corp.*, 131 F.3d 558, 563 (5th Cir.1998)). In determining whether a work environment is abusive, this Court

must consider the totality of the evidence, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfere[d] with an employee's work performance." *Shepherd v. Comptroller of Public Accounts of State of Tex.*, 168 F.3d 871, 874 (5th Cir.1999). The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

      The well-known Fifth Ciruit case of *McConathy v. Dr. Pepper/Seven-Up Corp.* demonstrates that the plaintiff must put forth considerable evidence for a court to find a hostile working environment.  In that case, the Fifth Circuit found that the alleged discrimination harassment was neither severe nor pervasive even though the plaintiff's supervisor was (1) unsupportive toward plaintiff when she needed several surgeries; (2) became angry and said she had "better get well this time" when plaintiff explained her need for additional surgery, (3) told plaintiff he would no longer tolerate her health problems; (4) complained about plaintiff's extensive use of the company's benefits; (5) pressured plaintiff to return to work before she recovered; (6) told plaintiff's co-workers to cease communicating with her; (7) transferred assignments away from plaintiff; and (8) refused to acknowledge plaintiff's presence. *McConathy v. Dr. Pepper/Seven-Up Corp.*, 131 F.3d 558, 563-64 (5th Cir. 1998).  Using this precedent, the undisputed facts in the instant case do not approach the requisite sufficiency to support a finding of a hostile work environment.

      Rather, the only evidence Calderone submits in support of her hostile work environment claim is the proposed Agreement where Calderone was referred to as "disabled."  Within the

same agreement, TARC outlined work accommodations to permit Calderone to work from home twenty hours (20) a week, demonstrating TARC's attempts to accommodate Calderone's injury. The Agreement therefore, rather than substantiating Calderone's claim of hostility, directly contradicts such an assertion. Calderone thus fails to set forth any type of repeated or extreme conduct that would constitute a hostile work environment based on her alleged disability.

It is obvious that the hostile work environment arose when Abels became CEO in 2010. Calderone repeatedly testified to this fact. When questioned about her resignation, Calderone references many clashes with Abels that occurred prior to her injury as the catalyst for her resignation. It is therefore apparent to this Court that the undisputed facts demonstrate an unpleaseant working environment that was borne from an adverse CEO/employee relationship and bore no relation to Calderone's alleged disability.

### 2. Constructive Discharge

Calderone alleges that TARC took adverse action against her and that this action ultimately compelled her resignation. Constructive discharge occurs when an employee has quit her job under circumstances that are treated as an involuntary termination of employment. *Haley v. Alliance Compressor LLC,* 391 F.3d 644, 649 (5th Cir.2004). To prove constructive discharge, a plaintiff must prove that working conditions were so intolerable that "a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders,* 542 U.S. 129, 141, (2004). The environment must be "something more" than that present in a harassment or hostile work environment claim; a plaintiff must show a " 'worse case' harassment scenario, harassment ratcheted up to the breaking point." *Id.* at 147–48.

In analyzing whether constructive discharge occurred, a court must look to the individual facts of each case without regard to the employee's subjective state of mind. *Barrow v. New*

*Orleans S.S. Ass'n,* 10 F.3d 292, 297 (5th Cir.1994). The following nonexclusive list of factors are relevant to the determination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a less experienced or qualified supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (7) offers of early retirement that would make the employee worse off regardless of whether the offer was accepted or not. *Id.* The resigning employee bears the burden to prove constructive discharge. *Jurgens v. E.E.O.C.,* 903 F.2d 386, 390–91 (5th Cir.1990).

The undisputed facts show that the instant case presents none of these factors.  In her resignation letter, Calderone clearly communicated her purpose for leaving – the problematic managing style of Abels.  Calderone corroborated this fact numerous times in her deposition when she repeatedly testified that she ultimately felt compelled to leave because she could no longer work in the hostile environment created by their tense relationship.  It is therefore evident that no disputed material fact exists as to Calderone's constructive discharge claim, and TARC did not constructively discharge Calderone based on disability discrimination.

### 3.Accommodation

Calderone's complaint alleges that TARC "failed to make a reasonable accommodation to the Plaintiff's known physical or mental limitations."  Calderone testified that she did *not* have physical or mental limitations when questioned regarding her claim that TARC failed to make accommodations for such limitations. (Rec. Doc. 13-4 at 133-134).  Moreover, the only accommodation she requested was to be closer to the door, and Calderone testified that TARC honored that request.  (Rec. Doc. 13-4 at 134).  There is therefore no disputed material fact that TARC did not fail to give reasonable accommodations for a disability.

### D. Louisiana Employment Discrimination Claims

While TARC moves for summary judgment on all claims, TARC fails to address Calderone's claims pursuant to Louisiana Employment Discrimination Law (LEDL). Nevertheless, the Fifth Circuit has held that claims brought under LEDL are analyzed using the same framework and precedent as the ADA claims, thus leading to the same result. *See Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir.1989); *see also Scott v. Turner Indus. Grp., LLC*, 2011 WL 5023840, *4 (M.D.La. Oct. 19, 2011) ("The ADA and LEDL provide similar rights and remedies, such that Louisiana courts routinely reference federal ADA jurisprudence when considering LEDL claims."). The Court can therefore apply the above ADA analysis and find that summary judgment is also appropriate to Calderone's claims under the LEDL

### V.   CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant TARC's Motion for Summary Judgment (Rec. Doc. 13) is **GRANTED** on all of Plaintiff Calderone's claims against TARC in favor of TARC.

New Orleans, Louisiana this 6th day of April, 2015.

_____
UNITED STATES DISTRICT JUDGE